Margaret E. CREMEN, Plaintiff,

v.

HARRAH'S MARINA HOTEL CASINO, Defendant/Third Party Plaintiff,

v.

LOCAL 54, HOTEL EMPLOYEES & RESTAURANT EMPLOYEES INTERNATIONAL UNION AFL–CIO, and Hotel and Restaurant Employees and Bartenders International Union Welfare Fund, Third Party Defendants.

Civ. A. No. 84–5223.

United States District Court, D. New Jersey.

Feb. 22, 1988.

 

Greenberg & Prior by Michael Barrett (argued), James Schwerin and William S. Greenberg, on the brief, Princeton, N.J., for plaintiff.

Horn, Kaplan, Goldberg, Gorny & Daniels by Jack Gorny, on the brief, Atlantic City, N.J., and Fisher & Phillips by James McDonald (argued), William F. Kaspers, on the brief, Atlanta, Ga., for defendant/third party plaintiff.

OPINION

GERRY, Chief Judge:

Plaintiff Margaret E. Cremen brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and various state tort law theories, against her former employer, Harrah's Marina Hotel Casino ("Harrah's"). Harrah's has, in turn, joined Local 54, Hotel Employees & Restaurant Employees International Union AFL–CIO, and the Hotel and Restaurant Employees and Bartenders International Union Welfare Fund ("Local 54") as third party defendants.[1]

FACTUAL BACKGROUND

Cremen was hired by Harrah's on April 23, 1984 to work as a cocktail server in the casino's public showroom. As part of her preparation for the job, plaintiff was required to complete a two week training course. One of the trainers Harrah's employed was a Mr. Bernard Morris. Morris also served as maître d'hotel in the showroom, and in that position exercised supervisory control over Cremen and the other cocktail servers.

According to plaintiff's deposition and complaint, Morris told the cocktail server trainees that he would be calling them "sweethearts and babies and his girls" and might periodically hold their hand or put his arm around them, but that there would be "nothing to it." Cremen Dep. at 52. On May 2, 1984, plaintiff was asked by Morris to report to his office after the other cocktail servers had been dismissed for the day.

When plaintiff reported to Morris' office, she was told to enter and sit down. Morris then closed the door of his office behind them. After discussing job-related details for a few minutes, Morris moved from behind his desk and sat in a chair situated between the door and plaintiff, locking the door in the process. Morris then asked

---

1. Harrah's avers, in a third party complaint, that Local 54 "contributed to and exacerbated" plaintiff's alleged emotional injuries by suggesting to her that she institute the instant action. A motion by Local 54 to dismiss Harrahs complaint was denied by this court on June 7, 1985. Local 54's actions with regard to plaintiff, and any potential liability they may be exposed to by virtue of such actions, are not at issue in the matter presently before the court.

plaintiff, a white woman, what her feelings were on dating black men. (Morris is black). He stated that he felt a "projected warmth" from her. Plaintiff allegedly tried to leave, but Morris grabbed her and tried to kiss her. Morris supposedly stated that if plaintiff "wanted the job, to prove it." Despite plaintiff's pleas not to do anything and her efforts to leave, Morris put out the lights, forced plaintiff to the floor and sexually assaulted her. Complaint ¶¶ 9–11. On May 3, 1984, plaintiff phoned Mr. Lathan Pridgen, Harrah's Affirmative Action Officer. Pridgen had previously given an orientation talk during training about sexual harassment on the job. Plaintiff did not at that time give her name, but reported that she'd been the victim of a sexual attack. Dep. at 91–92. Pridgen reportedly advised plaintiff that if she wanted to speak to him about it, she should report to his office when she returned to work.

The next day, May 4, 1984, plaintiff reported to Pridgen's office. According to plaintiff, Pridgen elicited a few details about the incident, and then asked her whether she wished to file a verbal or a written complaint. Plaintiff asked what the difference was, and was told that a written complaint would have to be brought to the attention of Morris' supervisors "and other people in the casino" whereas a verbal charge could be resolved informally between Pridgen and Morris. Dep. at 98. Plaintiff opted for the verbal complaint.

Morris, however, allegedly continued to harass plaintiff, both at work, where he attempted to hold her hand and put his arm around her, and at plaintiff's home, where he telephoned her repeatedly to apologize for hurting her. Upset by these continuing incidents, and dissatisfied by Harrah's response to the matter, plaintiff contacted her union shop steward on May 19, 1984. On May 21, 1984, the union contacted James Rafferty, Harrah's Industrial Relations Manager, and related plaintiff's charges against Morris to him. On May 27, 1984, Morris was suspended from employment. On June 1, 1984, Rafferty allegedly told plaintiff and the union's business

agent that Harrah's had received complaints from other female employees of incidents of sexual harassment involving Morris.

On July 30, 1984, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Harrah's had denied her rights under Title VII by reason of her sex. After receiving her right to sue letter from the EEOC, plaintiff commenced this action on December 19, 1984. In an amended complaint filed January 10, 1985, plaintiff, in addition to asserting a Title VII violation, also brought tort claims against Harrah's for battery (Amended Complaint, Count II), negligent hiring and retention (*Id.*, Count III), and intentional infliction of emotional distress (*Id.*, Count IV).

Harrah's moved for summary judgment on plaintiff's Title VII and pendent tort claims. In a Letter Opinion and Order dated January 9, 1987, this court denied the motion. As to the pendent state claims, we noted, *inter alia*, that we were "puzzled" by defendant Harrah's suggestion that plaintiff's state tort actions were barred by the New Jersey Worker's Compensation Act, N.J.S.A. § 34:15–1 *et seq.* However, we did "not rule out the possibility that defendant could support such an argument with more comprehensive briefing" and left Harrah's "free to renew its motion to dismiss the state claims on this basis." Letter Op. at 13. Harrah's has accepted this invitation and is again before us, seeking dismissal or, alternatively, summary judgment on plaintiff's pendent state claims, contending that plaintiff's alleged injuries are exclusively compensable under the Worker's Compensation Act.

## LEGAL ANALYSIS

As this motion is directed solely at plaintiff's pendent state claims, our inquiry is confined strictly to an examination of applicable or analogous state law. The New Jersey Worker's Compensation Act provides "compensation for personal injuries to, or for the death of, [an] employee by accident arising out of and in the course of employment." N.J.S.A. 34:15–7. Defend-

ant Harrah's, citing the fact that New Jersey courts have historically applied exceedingly liberal constructions of the crucial terms "accident," "arising out of" and "in the course of" employment, argues vigorously that plaintiff's alleged injuries are compensable only under the provisions of the Worker's Compensation statute, and therefore cannot support actions sounding in the state tort law. Plaintiff, on the other hand, employs a pair of out-of-state cases, *Pryor v. United States Gypsum Co.*, 585 F.Supp. 311 (W.D.Mo.1984) and *Cox v. Brazo*, 165 Ga.App. 888, 303 S.E.2d 71 (1983), aff'd. per curiam, 251 Ga. 491, 307 S.E.2d 474 (1983) which stand for the proposition that allegations of sexual assault and harassment fall outside the purview of a worker's compensation scheme and thus may be pursued via traditional tort avenues. Plaintiff, arguing correctly that there exists no New Jersey case which is on its facts so *directly* on point as these cited authorities, urges this court to adopt their reasoning and rationale, and allow her state claims to proceed.

Both parties, we believe, are somewhat misfocused in their treatment of the issues presented by this motion. The real difficulty, as this court perceives it, lies not in determining whether plaintiff's injuries are covered by the New Jersey law of Worker's Compensation. "[New Jersey] courts have consistently held that the Workmen's Compensation Act is to be construed liberally so as to bring as many cases as possible within its coverage." *Marshall v. Force Machinery Co.*, 123 N.J.Super. 497, 502, 303 A.2d 619, 621 (Law Div.1973). Toward this end, the courts of this state have always defined the operational terms of the statute with great breadth. In *Theodore v. Dover Board of Education*, 183 N.J. Super. 407, 444 A.2d 60 (App.Div.1982), the Appellate Division noted that "[i]n the workers' compensation context, ... the term 'accident' has traditionally been con-

strued to include all work-related episodes and events resulting in injury, and indeed all unexpected injuries." 183 N.J.Super. at 415, 444 A.2d at 65. "Accidents" for worker's compensation purposes thus may even include assaults by co-workers or supervisory employees of a "willful or criminal nature." *Meo v. Commercial Can Corp.*, 80 N.J.Super. 58, 62, 192 A.2d 854, 856 (App.Div.1963), and all injuries which are occasioned by such assaults.[2]

Moreover, the requirement that the episode occur "in the course of" employment to be compensable merely means that it must have happened within the period of employment, at a place where the worker might reasonably be, and while she was performing her duties of employment "or doing something incidental to it." *Tocci v. Tessler & Weiss, Inc.*, 28 N.J. 582, 586–87, 147 A.2d 783, 785 (1959); *Cavalcante v. Lockheed Electronics Co.*, 85 N.J.Super. 320, 204 A.2d 621 (Union Cty.Ct.1964) aff'd. 90 N.J.Super. 243 217 A.2d 140 (App.Div. 1966). Finally, and most importantly, New Jersey courts employ a "positional risk" or "but for" test for determining whether an incident "arose out of" employment for the purposes of worker's compensation. An exceptionally liberal test of causal connection, the positional risk analysis requires only that the employment in some fashion physically facilitated the occurrence of the incident. *Briggs v. American Biltrite*, 74 N.J. 185, 376 A.2d 1231 (1977). Under this approach, assaults by co-employees have been held compensable "even if the subject of the dispute is unrelated to the work ... if 'the work of the participants brought them together and created the relations and conditions which resulted in the clash.'" *Martin v. J. Lichtman & Sons*, 42 N.J. 81, 83, 199 A.2d 241, 242 (1964) quoting 1 *Larson; Workmen's Compensation Law* at 130 (1952). Thus, in *Crotty v. Driver Harris Co.*, 49 N.J.Super. 60, 139 A.2d 126 (App.Div.1958), the Appellate Di-

---

**2.** We are inclined here to agree with defendant Harrahs' assertion that plaintiff's claimed emotional distress and injuries stemming from the alleged assault and its aftermath would be fully compensable under New Jersey's worker's compensation scheme. As defendants point out,

"New Jersey courts have come to realize that mental and emotional distress is just as 'real' as physical pain, and that its valuation is no more difficult." Defendant's Brief at 9, *citing Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979).

vision held that the widow of a worker who was robbed and murdered by a co-employee in a shed located on work premises was entitled to receive worker's compensation benefits, because the assault, under the positional risk test, "arose out of" the victim's employment:

> While the employment may not have been the proximate cause of the fatal assault ... it assuredly was a contributing factor, providing the murderer with the place and opportunity to assault and rob his victim. But for the employment, the assault and death would not have occurred when it did. The assault in this case was related to the employment [because it] brought the employee into contact with a vicious, criminal or hot-tempered person.

49 N.J.Super. at 72, 139 A.2d at 133. Similarly, in *Doe v. St. Michael's Medical Center of Newark*, 184 N.J.Super. 1, 455 A.2d 40 (App.Div.1982), a case bearing some resemblance to the matter before us (and thus heavily relied upon by defendant Harrah's), a medical technologist who was sexually assaulted in her hospital dormitory was held to have injuries compensable under the Worker's Compensation Law because "[i]f not for her employment, she would not have been in the place where she was injured because she would otherwise have had no right to live there." 184 N.J. Super. at 7, 445 A.2d at 44.

■ The precepts developed in the above cases reflect a consistent commitment, on the part of the New Jersey courts, to extend the salutory aspects of worker's compensation—prompt and precisely measured recompense for employment-related injuries—to the broadest possible spectrum of work situations. Applying these precepts to the facts before us, it is readily apparent that plaintiff's claimed injuries stemming from the alleged sexual assault and harassment are fully compensable under the provisions of the New Jersey Worker's Compensation Act.

The alleged May 2, 1984 incident and subsequent episodes all took place while Cremen was employed by Harrah's, and while she was performing employment duties or "doing something incidental" to them. Thus, the episodes occurred "within the course of" plaintiff's employment. Using the positional risk analysis, Cremen's employment, and most specifically, her subordinate position to Morris, brought her into contact with an allegedly "vicious and criminal" actor, who wielded his supervisory status and control to force sexual advances, all of which took place on work premises. Thus, the claimed injuries "arose out of" plaintiff's employment. Finally, the incidents and injuries plaintiff claims, ranging from actual physical assault to emotional distress, all fall within the broad definition of "accident" for the purposes of worker's compensation. The authorities plaintiff cites for the proposition that sexual assault and harassment cannot be compensable under worker's compensation are not, in this regard, persuasive. They are based, respectively, upon principles of Missouri and Georgia law, which apparently do not follow the same definitional standards for compensable incidents as does New Jersey.[3]

---

**3.** In *Pryor v. United States Gypsum Co.*, 585 F.Supp. 311 (W.D.Mo.1984), the court appeared to rest its decision that the plaintiff's allegations of sexual assault and harassment were not covered by worker's compensation on two grounds. First, the court noted that most of plaintiff's claimed injuries consisted of "emotional distress, nervousness and damage to her reputation" which, because they were not predominately physical were not "of the type intended to be compensated by the pattern of the [Missouri] Workmen's Compensation Act." 585 F.Supp. at 316. *citing Gambrell v. Kansas City Chiefs Football Club*, 562 S.W.2d 163, 166 (Mo.App.1978). This court is convinced that the New Jersey system of Worker's Compensation, by contrast, contemplates full compensation for such emo-

tional and mental harms. See *supra* n. 2. Second, the court in *Pryor* held that plaintiff's alleged injuries did not, as a matter of law, arise out of her employment. The court's position there was somewhat puzzling, because although it acknowledged that Missouri law employed some form of the "positional risk" test, see 585 F.Supp. at 314, it actually used a much stronger standard of causal connection, holding that plaintiff's injuries had to have been "'a rational consequence of some hazard connected' with her employment". *Id.* at 316, *quoting Gregory v. Lewis Sales Co.*, 348 S.W.2d 743, 745 (Mo.App. 1961). Whatever the correct yardstick in Missouri, it is clear that New Jersey requires much less than a finding that the incident was a "ra-

Clearly then, plaintiff could pursue her non-federal claims for compensatory relief before the State Division of Worker's Compensation. But, as before stated, determining that this plaintiff's alleged injuries are covered by the Worker's Compensation Act does not reach the real difficulty posed by this motion. Rather, the difficult question is whether plaintiff's potential worker's compensation claim is her *exclusive* avenue for redress, or whether she may yet, alternatively or additionally, assert the state tort actions contained in Counts II through IV of her amended complaint.

Generally, where, as here, an employee's claimed injuries fall within the coverage of the worker's compensation law, the employee is barred from seeking further legal redress from an employer or co-employee. The "exclusivity" provision of the New Jersey Worker's Compensation Act, N.J.S.A. 34:15–8, provides in relevant part:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

The policy reasons behind the exclusive remedy feature were aptly set forth by the New Jersey Supreme Court in *Dudley v. Victor Lynn Lines, Inc.*, 32 N.J. 479, 161 A.2d 479 (1960):

> By accepting the benefits of the act, the employer assumes an absolute liability. He gains immunity from common-law suit, even though he be negligent, and is left with a limited and determined liability in all cases of work-connected injury. On the other hand, the employee forgoes his right to sue his employer for negligence, and to obtain the common law's measure of damages in cases where fault could be shown, but he gains a speedy and certain, though smaller, measure of damages for all work-connected injuries regardless of fault ... The intention is to "substitute finite liability for the fortuities of the common law remedy."

32 N.J. at 489, 161 A.2d at 484 (citations omitted).

■ Count III of plaintiff's amended complaint sounds in negligence. Specifically, it avers that defendant Harrah's acted in "a grossly negligent manner" by hiring maître d' Morris and then retaining him after allegations of sexual harassment were brought against him by plaintiff and, apparently, other cocktail servers. Considering the language of N.J.S.A. 34:15–8, and its interpretation by the New Jersey courts, we are constrained to hold that plaintiff cannot pursue this cause of action. Unfortunately for Cremen, this aspect of

---

tional consequence" of a work-related hazard in order to be considered as arising out of the employment for worker's compensation purposes. *See, e.g., Crotty v. Driver Harris Co.,* 49 N.J. Super. 60, 139 A.2d 126 (App.Div.1958). Similarly, in *Cox v. Brazo,* 165 Ga.App. 888, 303 S.E.2d 71 (1983), the Georgia Court of Appeals held that an employee's injuries occasioned by the sexual assault of her supervisor were not compensable under that state's worker's compensation act because they were "caused by the wilful act of a third person for personal reasons and did not arise out of her employment." 303 S.E.2d at 73. Under New Jersey law, however, wilful and even criminal acts of supervisory employees are compensable, *Meo v. Commercial Can Corp.,* 80 N.J.Super. 58, 62, 192 A.2d 854, 856 (App.Div.1963), even when they are undertaken for reasons unrelated to work. *Martin v. J. Lichtman & Sons,* 42 N.J. 81, 83, 199 A.2d 241, 242 (1964).

Parenthetically, we note that the *Pryor* and *Brazo* cases can be compared to and contrasted with decisions from other state jurisdictions that more closely parallel New Jersey's positional risk test for determining when an episode arises out of employment, and which consequently hold that sexual assaults committed by third persons or supervisors upon employees on work premises fall within the ambit of worker's compensation. *See, e.g., Williams v. Munford, Inc.,* 683 F.2d 938 (5th Cir.1982) (Mississippi Law requires only that the employment create a "zone of risks" for the accident to arise out of employment, thus rape of convenience store clerk by robber is compensable under Mississippi Worker's Compensation Act); *Lui v. Intercontinental Hotels Corp. (Hawaii),* 634 F.Supp. 684 (D.Haw.1986) (Hawaiian law, which holds that an attack arises out of employment for worker's compensation purposes so long as it has merely a "tenuous connection to work," requires that a sexual assault upon an employee by her supervisor during her working hours be covered by the state's worker's compensation provisions).

her case is on all fours with *Doe v. St. Michael's Medical Center, supra.* There, the plaintiff, a victim of a sexual assault, brought an action against her employer and landlord, the Medical Center, contending, *inter alia*, that the Center had been negligent in providing security in its hospital dormitory, thereby allowing a rapist to enter the facility and attack the plaintiff. After applying the strictures of New Jersey Worker's Compensation Act to the facts before them, the Appellate Division held that the incident was covered by the Act and that the plaintiff's common law action was thus barred. The court explained:

> Even though in this case the injured employee is resisting compensability, presumably in order to obtain a larger recovery in a civil action, we are bound by the principle requiring liberal interpretation of the Worker's Compensation Act in order to afford a certain remedy. "Consistency requires us to use the same legal yardstick ..."

184 N.J.Super. at 4, 445 A.2d at 42 (citation omitted). Accordingly, defendant Harrah's motion for dismissal as to Count III of plaintiff's amended complaint must be granted.

Because plaintiff's remaining state tort claims—battery (Count II) and intentional infliction of emotional distress (Count IV) are, like the harms associated with defendant's alleged negligent hiring and retention of Morris, compensable under the provisions of the Worker's Compensation Act, Harrah's insists that they too must fall to the Act's exclusivity bar. Harrah's argument, however, overlooks an important exception to the exclusivity feature of N.J. S.A. 34:15–8—the provision that claims asserting employment-related "intentional wrongs" are not exclusively covered under the worker's compensation scheme, but rather remain cognizable at common law. This exception requires us to consider a question of first impression: whether allegations of sexual assault and, more broadly, sexual harassment, should be considered allegations of "intentional wrongs" as the term is meant to be defined in N.J.S. A. 34:15–8.

Until recently, judicial discussion of the intentional wrong exception to the New Jersey Worker's Compensation Act was limited to emphasizing the narrow nature of its application; it was only available in those instances where an employer's actions evinced a "deliberate intention" to harm an employee, *Bryan v. Jeffers*, 103 N.J.Super. 522, 524, 248 A.2d 129, 130 (App.Div.1968), *cert. denied*, 53 N.J. 581, 252 A.2d 157 (1969), that was "comparable to an intentional left jab to the chin." 2A *Larson, supra* § 68.13 at 27. Under this interpretation, only the actual sexual assault alleged by plaintiff would appear to have been covered by the intentional wrong exception; the emotional injuries inflicted by the alleged pattern of sexual harassment that followed and by Harrah's management's putative failure to deal promptly and adequately with the situation would not suffice. Further, it was uncertain whether the narrow class of deliberate, inflicted harms considered to be "intentional wrongs" could be imputed to the employer when they were committed by a co-employee or a supervisor. Indeed, principles of the law of agency seemed to suggest that the more "outrageous" the act, the more likely that it would be considerably "purely personal" and thus outside the scope of the actor's employment. *See, Restatement of Agency, 2d § 235*, Comment C ("the fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business ... [but] is merely using the opportunity afforded by the circumstances to do the harm.") Thus, assuming Cremen could prove that Morris committed "intentional wrongs" by sexually attacking and harassing her, it would be far from clear that such acts could be automatically imputed to defendant Harrah's.[4]

---

4. *But see* W. Prosser, Law of Torts § 70, at 466 (4th Ed.1971):

"There has been a tendency in the later cases, however, to allow recovery [against an employer for the intentional torts of his agent]

Fortunately for plaintiff, the New Jersey Supreme Court in *Millison v. E.I. du Pont deNemours & Co.*, 101 N.J. 161, 501 A.2d 505 (1985), has now refined and clarified the test for determining whether an employment-related episode or incident qualifies as an "intentional wrong" for the purposes of removing the exclusivity bar of the worker's compensation act.

In *Millison,* the court acknowledged and reaffirmed the settled view that the "statutory scheme [of the worker's compensation law] contemplates that as many work-related disability claims as possible be processed exclusively within the Act." 101 N.J. at 177, 501 A.2d at 513. Nonetheless, the court felt "certain that the legislature could not have intended that the system of worker's compensation would insulate actors from liability outside the boundaries of the Act for all willful and flagrant misconduct short of deliberate assault and battery ..." *Id.* Therefore, the court altered the standard for determining when employer conduct constitutes an "intentional wrong". The new approach dissolved the necessity of proving that the employer possessed a subjective intention to inflict deliberate injury. In its place, the court substituted the less stringent requirement of showing that an employer's actions were "substantially certain" to cause the complained-of harm. *Id.* at 177-78, 501 A.2d at 514. Further, *Millison* held that, in determining which episodes or incidents rise to the level of actionable intentional wrongs,

> Courts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act?

*Id.* at 179, 501 A.2d at 514 (emphasis in original). Finally, *Millison* settled the issue of employer liability for the intentional wrongs of co-employees and supervisors. In response to the argument that the intentional wrong exception of N.J.S.A. 34:15–8 applied only to co-employees and not to employers, thus rendering worker's compensation still the sole remedy in actions against an employer, the court stated:

> We are convinced that the intentional wrongs of an employer as well as those of co-employees fall outside of the boundaries of the Compensation Act. Whenever, as here, the employer is a corporation, the employer can act only through its employees, so for practical purposes actions taken by certain corporate officers and supervisors are actions taken by the corporate-employer.

*Id.* at 185, 501 A.2d at 518.[5]

In *Millison,* the court held that allegations that an employer knowingly exposed

on the ground that the employment has provided a peculiar opportunity and even incentive for such [a harm]."
*See e.g., Howard University v. Best,* 484 A.2d 958, 987 (D.C.App.1984). (University liable for the alleged sexual harassment of Dean even though alleged assaults "motivated in part by passion, savagery or personal revenge").

5. Despite this clear language in *Millison,* Harrah's insisted at oral argument that the "intentional wrong" exception in N.J.S.A. 34:15–8 applies only to co-employees, thus leaving worker's compensation still plaintiff's exclusive remedy in an action against her employer. As noted above, this argument was advanced in *Millison* and squarely rejected by the New Jersey high court.

Alternatively, Harrah's would have us read *Millison* as standing for the proposition that intentional acts of co-employees are imputable to the employer and covered by the intentional wrong proviso if, and only if, the co-employee's acts are performed pursuant to some articulable "corporate policy" or are undertaken pursuant to an order from high management. Any other interpretation, argues Harrah's, would mean that virtually any intentional tort committed by a co-employee would be considered an "intentional wrong" and thus would not be "covered" by worker's compensation, in contravention to a line of cases, such as *Crotty v. Driver Harris, supra,* which have held that intentional, and even criminal acts by co-employees are cognizable under the system of worker's compensation.

There are several flaws with this proffered interpretation. First, and foremost, there is nothing in the language of *Millison* which would serve to confine the "intentional wrong" exception only to those instances when a co-employee's actions were taken in clear furtherance of "corporate policy." The *Millison* court simply noted that allegations that the du Pont medical

its workers to the dangers of asbestos did not trigger the intentional wrong exception of N.J.S.A. 34:15–8 because the Worker's Compensation Act, in specifically providing coverage for occupational diseases, had "confront[ed] head-on the unpleasant, even harsh, reality . . . that industry knowingly exposes workers to the risks of injury and disease." *Id.* at 177, 501 A.2d at 513. Thus, intentional exposure to disease-bearing hazards was viewed by the court "as a fact of life of industrial employment" contemplated by the compensation act and exclusively remediable by the Act's provisions. On the other hand, the *Millison* court found that allegations that company doctors had concealed from the plaintiffs the fact that they were suffering from asbestos-related diseases did implicate an intentional wrong, because "[a]n employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume." *Id.* at 182, 501 A.2d at 516. Further, the court found that the actual instances of concealment, undertaken by the company physicians, were fully imputable to the employer. *Id.* at 186, 501 A.2d at 518.

■ Applying the principles developed in *Millison* to the matter before us, and taking all of plaintiff's allegations as true, this court finds that the incidents as averred are "sufficiently flagrant" so as to constitute "intentional wrongs", thereby entitling Cremen to pursue her actions for battery and intentional infliction of emotional distress. *Id.* at 176, 501 A.2d at 513. Surely, the May 2 assault would so classify even

under the old "deliberate intention" standard, and *Millison* now provides that Harrah's may not use the worker's compensation statute to shield itself from liability for the battery inflicted by one of its supervisory employees. More importantly, this court believes that Cremen's version of the events occurring in the aftermath of the assault—and Harrah's reaction to them—rise to the level of "intentional wrongs" as defined by the *Millison* "substantial certainty" test.

The pattern of harassment allegedly visited upon plaintiff by Morris, occurring in the immediate wake of the May 2 attack, was "substantially certain" to inflict the emotional harm plaintiff claims. Similarly, defendant Harrah's cavalier response to the situation—retaining Morris in a position where he continued to exercise direct authority over plaintiff, and apparently conducting no adequate internal investigation of the incident until weeks after its occurrence—was "virtually certain" to contribute to plaintiff's alleged injuries. *Millison,* 101 N.J. at 178, 501 A.2d at 514. Moreover, when we examine, as *Millison* requires us to do, the *context* in which the alleged conduct of Morris and Harrah's took place, we are persuaded that such conduct constitutes an "intentional wrong". In every case of which we are aware, courts that have grappled with the troubling issue of sexual harassment in the workplace have refused to accept it as "a fact of life of industrial employment." *Millison,* 101 N.J. at 179, 501 A.2d at 514.[6]

---

department was controlled by the corporation only "point up the fact that the acts of a co-employee are for practical purposes identical to the acts of his employer." 101 N.J. at 186, 501 A.2d at 518. Indeed, the *Millison* court's unequivocal language and the current trend of the law regarding an employer's liability for the intentional torts of a co-employee, see, *supra,* n. 4, counsels in favor of much more liberal interpretation of the scope of the "intentional wrong" exception. Further, such a broad interpretation would not conflict with the *Crotty* line of cases: it would not mean that intentional torts of co-employees were outside the scope of worker's compensation. Instead, it would mean that such acts, while fully covered by the compensation statute, are not necessarily barred from being also actionable at common law.

6. Not surprisingly, this view is shared by legal commentators. *See* Comment, *A Theory of Tort Liability For Sexual Harassment in the Workplace,* 134 U.Pa.L.Rev. 1461, 1492–93 (1986) ("The relationship between sexual harassment and a woman's employment is entirely different from that between a job associated risk and the job itself. Harassment arises from an employer or other man's personal motivation to maintain authority over female workers; in contrast, the occupational hazards covered in most worker's compensation statutes arise from foreseeable risks inherent in the work environment.") *See also,* Love, *Actions for Non-physical Harm: The Relationship between the Tort System and No-Fault Compensation,* 73 Cal.L.Rev. 857, 875–76 (1985); Note, *Sexual Harassment in the Work-*

In *Bennett v. Furr's Cafeterias, Inc.*, 549 F.Supp. 887, 890 (D.Colo.1982) the United States District Court for the District of Colorado held that "it would appear to lie outside the bounds of reason to propose that the sort of sexual assault and harassment heretofore described and the emotional trauma alleged to have been caused thereby result from risks inherent to the [employment] position ..." In *Pryor v. United States Gypsum Co., supra,* the District Court for the Western District of Missouri was "simply not prepared to say that a female who goes to work in what is apparently a predominately male workplace should reasonably expect sexual harassment as part of her job...." 585 F.Supp. at 316. And, in *Lui v. Intercontinental Hotels, supra,* the District Court for the District of Hawaii noted, "it is hard to imagine that a sexual assault committed by one's superior is a risk connected with one's job." 634 F.Supp. at 686–87. These authorities reflect an awareness of the essential *quid pro quo* that exists behind the exclusivity feature of worker's compensation laws—the employee relinquishes the right to bring suit in exchange for prompt compensation for all injuries stemming from *job-associated* risks. The *quid pro quo* breaks down, however, when the injuries arise from a risk not inherent, not a "fact of life" in the employment. Like the above-cited authorities, this court cannot believe that the job description of a cocktail server at a major casino reasonably contemplates exposure to sexual assault or harassment from the server's superiors or co-workers. Accordingly, we hold that the intentional harms Cremen alleges are "plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act." *Millison,* 101 N.J. at 179, 501 A.2d at 514 (emphasis in original). Defendant Harrah's motion for dismissal or alternatively summary judgment as to plaintiff's claims for battery and intentional infliction of emotional distress, therefore, is denied.

*place: A Practitioner's Guide to Tort Actions,* 10

An appropriate Order shall be prepared and entered.

## ORDER

This matter having been brought on motion by defendant/third party plaintiff Harrah's Marina Hotel Casino; and

The court having considered the submissions of the parties; and for good cause shown;

IT IS on this 22nd day of February, 1988, hereby

ORDERED that defendant/third party plaintiff's motion for dismissal as to Count III of plaintiff's complaint is GRANTED; and it is further

ORDERED that defendant/third party plaintiff's motion for dismissal or in the alternative for summary judgment as to plaintiff's claims for battery and intentional infliction of emotional distress is DENIED.

Golden Gate U.L.Rev. 879, 927 (1980).